Reza Rastegar ESFAHANI and Morteza Rastegar Djavaheri, Plaintiffs,

v.

CITIBANK, N.A., Defendant.

No. 83 Civ. 6638 (KTD).

United States District Court,
S.D. New York.

June 1, 1984.

Stroock & Stroock & Lavan, New York City, for plaintiffs; Alvin K. Hellerstein, Rita E. Hauser, Curtis C. Mechling, Ronald M. Edelstein, New York City, of counsel.

Shearman & Sterling, New York City, for defendant; Joseph T. McLaughlin, Daniel Levin, New York City, of counsel.

## MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Defendant Citibank, N.A. ("Citibank") moves to dismiss plaintiffs' Reza Rastegar Esfahani and Morteza Rastegar Djavaheri (the "Rastegars") complaint on the basis of *forum non conveniens*. For the reasons that follow, defendant's motion is denied.

### BACKGROUND

The relevant allegations of plaintiffs' action are as follows. The Rastegars owned Calcimine Company, Ltd. ("Calci-

mine"), an Iranian mining company, until the summer of 1979 when it was expropriated by the Khomeini government. Prior to that, in 1974 and 1975, the Rastegars engaged in two transactions in which $10 million was loaned to Calcimine by either Citibank Paris or the Rastegars. The Rastegars deposited $10 million in Citibank Paris and $10 million was lent to Calcimine.[1] The purpose of these two $5 million loans was to provide financing for a projected expansion and modernization of Calcimine's Iranian operations, including the purchase of French mining equipment. Citibank Paris and the Rastegars signed "fiduciary loan agreements" to facilitate this transaction. The agreements contained express forum-selection clauses designating Paris as the situs for initiation of suits arising out of disputes concerning the agreements. Personal guarantees of repayment by Calcimine also were executed by the Rastegars on both $5 million loans. Later in 1975, the first $5 million loan was assigned from Citibank Paris to the Rastegars (a "Cession de Creances"). The Cession de Creances also contained a forum-selection clause requiring that any suit be brought in Paris.

Interest payments on the 1974 loan were made on schedule from October 1, 1974 through August 31, 1978, and on the 1975 loan from September 9, 1975 through May 31, 1978. Total interest payments on the two loans of $2,338,000 were paid into the Rastegars account at Citibank Paris. From these interest payments, Citibank Paris deducted $94,000 in commissions.

From May 1978 to June 1982 Citibank Paris asserts that it repeatedly requested that Calcimine make its scheduled payments on the two loans. Initially, according to Citibank Paris, the Rastegars re-

quested and obtained on behalf of Calcimine, a rescheduling of the debt. On previous reschedulings the Rastegars had signed letters discharging Citibank Paris from any potential liability resulting from the discharges.

In the summer of 1979 the Rastegars' Calcimine shares were taken over by the Iranian government. On January 19, 1981, Iran and the United States signed the "Algiers Accords" setting forth the conditions for the release of the American hostages and the settlement of claims between the two countries. One agreement, the "Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran," provided for the submission of all unsettled claims between Americans and Iran to an arbitral tribunal at the Hague.

As alleged in plaintiffs' complaint, during the months that followed Citibank repeatedly promised that it would attempt to collect or settle with Iran the $10 million loans to Calcimine. Plaintiff Reza Rastegar Esfahani's affidavit relates that he was told by Citibank Paris that Citibank in New York would be handling their claims as part of the total package of claims that Citibank held against Iran. Therefore, according to Esfahani, he and his brother had no further contact with Citibank Paris concerning the Calcimine loans; they were told that all collection efforts were being directed from New York.

In September 1981, Esfahani states that he met with an official of Citibank in New York who stated that Citibank was negotiating settlement of all of Citibank's claims

---

1. The Rastegars contend that these were Citibank Paris loans similar to certificate of deposit-backed loans. Citibank vehemently denies this, and asserts that these were "accomodation loans." According to Citibank, it was not lending any of its own money, but rather merely acting as a conduit through which the Rastegars' money was deposited and lent to Calcimine. Fortunately, the distinction is not particularly significant to this motion. Nevertheless,

it highlights a problem raised by Citibank's motion. On numerous occasions Citibank seeks to have this court resolve factual disputes on this motion to dismiss. This is inappropriate. *See Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam) ("taking as true the allegations of the complaint, as they must be on a motion to dismiss, the complaint stated a cause of action").

including the Calcimine loans, and that the Rastegars "should do nothing to disturb the negotiations .... In the future [Esfahani] should contact Mr. West [of Citibank] directly in New York whenever [he] wanted information about Citibank's progress in its efforts to collect the loans." Esfahani Affidavit at 13. Further meetings were held in New York in August 1982, and in January and April 1983, between the Rastegars or their children and Citibank officials. Numerous telephone discussions also were had with New York Citibank officials. Throughout these meetings and conversations plaintiffs' allege that Citibank reassured the Rastegars that Citibank would attempt to settle the Calcimine loans as part of Citibank's world-wide claims against Iran. Citibank also asked and the Rastegars agreed to pay a pro rata share of Citibank's legal expenses in negotiating the settlement.

At a second April meeting in 1983, Citibank informed Esfahani's son that Iran had refused to pay any of the Calcimine loans, but that Iran had made an overall settlement of all of Citibank's other non-syndicated loan claims. Citibank also stated that it had given Iran an indemnification letter holding Iran harmless in the event that plaintiffs' family sued Iran or Calcimine for nonpayment of the $10 million loans.

Plaintiffs thereafter brought this action for breach of fiduciary duty in the Southern District of New York seeking a pro rata share of the settlement proceeds re-

ceived by Citibank. Citibank made this motion to dismiss.[2]

## DISCUSSION

The contours of the doctrine of *forum non conveniens* were discussed extensively by the Supreme Court in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). In *Gulf Oil,* the Court set forth various public and private interests potentially relevant to a *forum non conveniens* motion. *See generally id.* at 508–509, 67 S.Ct. at 843. The list was not meant to be exhaustive. *See id.* In support of its motion, defendant cites the following private interests noted in *Gulf Oil:* (1) ease of access to sources of proof, (2) availability of compulsory process for witnesses, documents, and potential third parties, (3) necessity for translation of documents, (4) the forum-selection clauses, and (5) the locus of events.

Despite defendant's contrary assertion, I do not find these factors persuasive. First, defendant has distorted plaintiffs' claim to make it appear that the locus of events (and thus witnesses and documents) is in France and that the forum-selection clauses of the fiduciary contracts govern the instant dispute. Plaintiffs, however, are not suing on the fiduciary contracts entered into in Paris in 1974 and 1975. Rather, plaintiffs are suing for a breach of a fiduciary duty undertaken, ostensibly performed, and breached all in the Southern District of New York between 1981 and 1983.[3] Fur-

---

**2.** In support of its motion, Citibank states that it would agree to the following conditions.

(a) Citibank will consent to jurisdiction in any appropriate tribunal in Paris, France;

(b) Citibank will agree that any applicable statute of limitations was tolled while this action was pending here;

(c) Citibank will produce any documents and employees located in New York to the same extent as if they were located in Paris; and

(d) Citibank will satisfy any judgment of a Paris court.

Affidavit of Patrick J. Mulhern (Senior Vice President and General Counsel of Citibank) ¶ 3 at 2.

**3.** The "fiduciary" label on plaintiffs' legal theory, in fact, is quite different from "fiduciary" in "fiduciary contracts." Defendant admits this:

Such "fiduciary loans," which do not appear to be used in the United States, apparently are common in Europe. The concept developed in Switzerland. Although the loans are called "fiduciary loans" they do not create fiduciary relations as that term is commonly used in the United States. Rather, the essence of these loans is that they are made as an accommodation to, and for the account and exclusive risk of, the party funding the loan. *See* Roethenmund, R., *The Swiss Banking Handbook* (1980) at 158 (attached as Exhibit P to the McLaughlin Affidavit).

Citibank's Memorandum of Law at 4 n. *. Nevertheless, Citibank insists on characterizing

thermore, with respect to access to sources of proof, defendant again distorts the essence of plaintiffs' complaint. The numerous documents and individuals located at Citibank Paris who arranged the 1974 and 1975 loans are at most peripherally related to plaintiffs' suit alleging a breach of a fiduciary duty entered into in New York in 1981. On the other hand, Citibank, its employees who undertook and allegedly breached the fiduciary duties, and plaintiffs' children who engaged in most of the discussions with Citibank, are all located in the Southern District of New York. The only private interest that strongly weighs in defendant's favor is the parties' ability to add Calcimine as a party or to produce relevant Calcimine witnesses and documents before and during trial. Nevertheless, even this factor's weight is somewhat reduced because Citibank has indemnified Calcimine and Iran against any suit by the plaintiffs concerning the loans.

Defendant cites two principal public interests: (1) the forum's interest in the litigation, and (2) the need to interpret foreign law. These two factors, however, are close questions. Citibank makes much of plaintiff's nonresident alien status. Nonetheless, defendant is a New York institution, and its performance of fiduciary obligations undertaken in the United States is decidedly a matter of importance to this district. Many of the promises defendant made, moreover, were to plaintiffs' "agents" or children who are permanent alien residents but who hope to become United States' citizens. Last, it is not at all clear that French law applies in this case as Citibank maintains. At least one "expert" in this legal area asserts that New York law would apply, and that, in any case, the applicable French law would not be markedly different. *See* Affidavit of Andreas F. Lowenfeld at 10. In both jurisdictions, "an agent is required to carry out the instructions of his principal and cannot place his own interests before those of his principal." *Id.*

In sum, the relevant public and private interests at stake in this litigation tip slightly in plaintiffs' favor. Therefore, Citibank's motion must be denied. *See Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843 ("unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"). Accordingly, Citibank's motion to dismiss is denied.

SO ORDERED.

---

plaintiffs' breach of fiduciary duty claim as one based on an alleged dispute concerning the fiduciary contracts.